**Essie B. LANUM, Plaintiff,**

v.

**Mark H. SHELLANS, Defendant.**

**Civ. A. No. 80–0095–L.**

United States District Court,
W. D. Virginia,
Lynchburg Division.

Sept. 25, 1981.

Shuler A. Kizer, Buena Vista, Va., for plaintiff.

J. Leyburn Mosby, Jr., Lynchburg, Va., for defendant.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiff, Essie B. Lanum, brings this action seeking monetary damages for breach of contract against the defendant, Mark H. Shellans. Plaintiff has properly invoked the jurisdiction of this court pursuant to 28 U.S.C. § 1332(a), the parties being citizens of different states and the amount in controversy exceeding Ten Thousand and no/100 Dollars ($10,000.00), exclusive of interest and costs. The trial was heard by the court, sitting without a jury, on May 12, 1981. Specifically, the plaintiff alleged that she entered into a contract with the defendant for the sale of certain real property and that subsequently the defendant breached that contract. As a defense the defendant asserts that there was a mutual mistake of fact allowing for recision of the contract or, in the alternative, that the plaintiff, or her agents, made a material misrepresentation of fact concerning the property to the defendant and that he relied on it in good faith. The case is now ripe for disposition.

The facts of this case are of strong importance and accordingly will be outlined in considerable detail. In early October, 1979, the defendant, a resident of California, came to the Washington, D.C., area on a business trip. Finding time on his hands, the defendant traveled southwest, into Virginia, in hope of locating a parcel of real property to which he could someday retire. On the morning of October 4, 1979, the defendant, then in Buena Vista, Virginia, called Century 21—Ramsey Real Estate in response to an advertisement he saw in a local newspaper. In response to Mr. Shellans' call, both W. P. (Skip) Ramsey, Jr. and Cindy P. Lotts, employees of Ramsey Real Estate, picked Mr. Shellans up at his motel in order to show him some property. Mr. Ramsey, Jr., is a licensed realtor and broker, whose father owns the company, and Mrs. Lotts is a licensed realtor. Ramsey, Jr. and Lotts took the defendant to a tract of land in Amherst County, Virginia, known as the Byers property which is situated on the west side of Pedlar river near old Route 13 and Route 605, about one mile north of U. S. Route 60. On the way to the property Mr. Shellans was given a hand drawn plat of the property he was to be shown. (Plaintiff's Exhibit # 1). This plat showed only one access to the property, that being a road starting at old Route 13 and leading to what the court will refer to as the upper portions of the Byers property. This road is labeled—U.S. Government logging road—followed by some indecipherable writing. On the plat, to the left of where this road intersects with old Route 13, is written—Road under special use permit to Maddox Land and Timber Co. 4/11/76. Shellans and the two agents approached the property on Route 605, and then took a left turn off the state road and drove up to the Pedlar river. There was no bridge across the river so the three got out and crossed a footbridge to gain access to what the court will refer to as the lower portions of the Byers property. The land rises gradually

up from the river and then quite sharply until it approaches a ridge where it somewhat flattens out on top. This ridge is the upper portion of the property previously referred to where the logging road leads out to old Route 13. The property was described as a quarter of a bowl with the access from Route 605 leading to the bottom of the bowl and the logging road leading to the top. There was testimony that there had been a road on the property that led from the lower portion to the upper portion of the property but that it had not been used in years and had grown up. The evidence was conflicting as to whether it was utilizable in its present state but the preponderance of the evidence indicates that a significant degree of work would be required in order to make it passable. On the lower portion of the property there were various improvements consisting of an old log house, two out-buildings and a mobile home in which a Mr. Cain Davis was living.

Not surprisingly the testimony of the defendant and the two agents as to what was said on the property differs somewhat. Mrs. Lotts testified as follows: that Shellans wanted some acreage but that his primary concern was that he obtain river frontage; that Shellans never said what he wanted the property for, that he never asked about a right of way and that no other right of way than the right of way from Route 605 was ever represented to him. She said it was Ramsey, Jr. who first mentioned the logging road and that she does not know if he told the defendant that it was a way to get to the top of the property or not, but that she did hear Ramsey, Jr. tell a story about how his father had torn up a jeep trying to use the logging road. She admits that she did not hear everything said between Ramsey, Jr. and Shellans because at one point they left her to inspect a spring on the property. Lotts further testified that after they had been there a while Mr. Bradley, Mrs. Lanum's brother-in-law, walked up and that there was some talk between him and Shellans about exchanging, if Shellans were to buy, some of the Byers property for some adjacent property Bradley owned that stuck out into the center of the Byers property in the shape of a peninsula. Ramsey, Jr.'s testimony was in agreement that Shellans had made no mention of what he intended to do with the property and that he, Ramsey, Jr. had pointed out the logging road on the sketch he gave Shellans. Ramsey, Jr. said that he told Shellans that the logging road, "Was a way to get to the top of the property" and that his father had torn up a jeep trying to use it but he denies having ever said it was a right of way. He averred that he told the defendant that the right of way to the property was the way they had come into the property. Mr. Shellans' testimony differed somewhat. He testified that he told the two agents that his plans were to come back some day to the property and build a home. The defendant said he pointed to the logging road on the plat and asked, "Is this the way we came in?" Ramsey, Jr. said no and pointed out where, on the plat, they had entered. Shellans said that he then asked if the logging road was a right of way and that Ramsey, Jr. answered in the affirmative. Shellans further testified that at one juncture he pointed to the upper portion of the property and asked, "How do you get up there?", and that Ramsey, Jr. responded, "By the logging road." Shellans admitted seeing the legend on the plat—Road under special use permit to Maddox Land and Timber Co. 4/11/76—but said he thought it just described the road.

After approximately 30 minutes on the property the three retired to the conference room at the Ramsey Real Estate office. Mr. Shellans indicated that he would like to make an offer of $800.00 per acre for the property and a closing date of April 1, 1980, was chosen in order to allow time for a survey to be completed. A standard form contract was prepared and made contingent upon these three typewritten conditions:

1. Purchaser will retain same amount of river frontage (Plat Book B, Page 153 Amherst County Clerk's Office, Attached).

2. Purchaser will retain current rights of way to property.

3. Offer subject to survey (Paid by Seller).

Mrs. Lotts testified that the defendant expressed only two concerns with respect to the offer. He wanted to retain the same amount of river frontage that was represented to him on the plat and he wanted to pay for the land by the acre instead of paying the listing price. She said that because of these two concerns the first and the third conditions in the contract were inserted at the defendant's direction. The first condition guaranteed him the river frontage and the third was necessary if he was to pay by the acre. Mrs. Lotts insisted that Shellans made no mention of rights of way and that it was at the suggestion of Mr. Ramsey, Sr., not Shellans, that the second condition, the retention of the current rights of way, was included in the contract. Mrs. Lotts said this condition referred only to the right of way from Route 605 and was suggested in order to protect Mr. Shellans. She said that rights of way was used in the plural because two separate pieces of property had to be crossed in order to travel from Route 605 to the lower portion of the Byers property. By making the contract contingent on Shellans obtaining two rights of way, he would be protected if a right of way was obtained over one piece of property but not over the other. Ramsey, Jr. concurred both in that it was his father, Ramsey, Sr., who suggested the language, "current rights of way," and that river frontage was the most important thing to the defendant. Ramsey, Jr. pointed out that Shellans did not request that the survey show the right of way to the upper portion of the property. Mr. Ramsey, Sr. also testified that the second condition—Purchaser will retain current rights of way—was put in the contract at his suggestion. Mr. Shellans, however, testified that it was he who specifically requested the first two typewritten conditions on the contract, but not the third. In response Shellans said he appeared to be only concerned with the lower right of way because he thought the logging road shown on the plat he was given clearly showed that there was access to the upper portion of the property. The plat did not show, however, any access from Route 605 to the river and this is why he requested the language, "rights of way," be made a condition of the contract.

On October 23, 1979, Mrs. Lotts wrote the defendant to notify him that the survey had been completed earlier than expected and that it would now be possible to close before the first of the year. Mr. Shellans responded to Mrs. Lotts' letter by phone on October 31, 1979. Mrs. Lotts testified that the defendant gave her the following list of things he wanted in order to close:

1. Copy of the tax bill
2. Copy of the survey
3. Amherst County map
4. Title insurance
5. Current right of way from the road to the river in the deed
6. No prepayment penalty
7. Mineral rights
8. Did not want boundaries marked
9. Two deeds to the property

Mrs. Lotts further testified that Mr. Shellans said he did not wish to close until after the first of the year. She said the defendant never made any mention of the logging road during the conversation and that she knew nothing of his not wanting to close until Mr. Ramsey, Sr. received a letter from Shellans' attorney, Wilson Miller, on February 22, 1980 (Defendant's Exhibit # 3). In rebuttal, the defendant introduced into evidence (Defendant's Exhibit # 5) the above mentioned list he represents that he prepared in anticipation of his October 31, 1979, telephone conversation with Mrs. Lotts. Mr. Shellans' list differs somewhat from what Mrs. Lotts said her notes from the conversation reflect. Mr. Shellans' list reads:

1. Title insurance
2. Rights of way
3. No prepayment
4. No boundary markings
5. Insure mineral rights
6. Copy of last tax bill
7. Map

8. Copy of survey

9. 2 deeds

The significant difference between the two of course is that Shellans' list refers to "rights of way" while Mrs. Lotts' notes said "current right of way from the road to the river in the deed." Nothing further of relevance occurred until Mr. Ramsey, Sr., received Wilson Miller's letter notifying him that Mr. Shellans would not close on the property. The reason given was that no right of way from old Route 13 to the upper portion of the property existed or could be obtained and that Mr. Shellans' position was that a right of way to both the upper and lower portions of the property was represented to him and both were essential and material to the performance of the contract. Subsequently, the closing date of April 1, 1980, passed and on April 26, 1980, the property was sold at public auction for a price substantially lower than the contract price of $800.00 per acre. Mrs. Lanum has brought this suit alleging breach of contract and asks for the difference between the contract price and the price obtained at public auction.

■ Initially the plaintiff has a threefold burden to prove liability. The plaintiff must show she had a valid contract with the defendant, that she was ready, willing and able to close, and finally that the contract was in fact not closed because of the defendant's refusal. These requirements are neatly satisfied by the stipulations both counsel agreed to prior to trial. Counsel for both parties stipulated as to the validity of the contract, the willingness and the ability of the plaintiff to close, and that it was in fact not closed. If this third stipulation is inadequate to satisfy the third requirement, in that it fails to place the blame for the failure to close on the defendant, this requirement is satisfied by Wilson Miller's letter of February 22, 1980, to Ramsey, Sr. (Defendant's Exhibit # 3). Accordingly, the burden now shifts to the defendant to show, by a preponderance of the evidence, that either there was a mutual mistake of fact between the parties concerning a material object of the contract or that (a) plain-

tiff's agents made representations of two rights of way to the defendant and (b) that the representations of two rights of way were a material fact inducing the defendant to enter into the contract and (c) that the defendant relied on the representations in good faith.

■ The defendant's opening defense of mutual mistake of fact must fall. Not one scintilla of evidence has been produced indicating that the plaintiff, or her agents, were operating under a mistake of fact. While there is some evidence that the defendant was functioning under a mistake of fact it is horn book law that both parties must be mistaken as to a material object of the contract. Thus the defendant is left with his defense of material misrepresentation. If the defendant fails to prove by a preponderance of the evidence any one of the three elements outlined above, his liability will be established.

■ The evidence is conflicting as to whether plaintiff's agents represented to the defendant that a right of way existed along the logging road. In the defendant's favor we have in evidence the fact that Ramsey, Jr. gave Shellans the hand drawn plat showing the logging road; we have Shellans' assertion that he was told and that he believed the logging road was a right of way; we have the second condition in the contract that refers to rights of way in the plural; we have Ramsey, Jr.'s admission that he told Shellans that the logging road was a way to get to the top of the property; and we have Shellans' list which he prepared for the October 31 phone call in which he wrote "rights of way." On the other hand, there is considerable evidence that the logging road was not represented to be a right of way. The logging road shown on the plat Shellans was given was labeled, U.S. Government Logging Road, and did bear the legend, Road under special use permit to Maddox Land and Timber Company 4/11/76. At the very least, a reasonable man would infer that the logging road belonged to the federal government. Both Ramsey, Jr. and Lotts testified that Shellans was interested in river front-

age and that he did not ask about the logging road. On the contrary, it was Ramsey, Jr. who mentioned it. Both insisted they never told or represented to Shellans that the logging road was a right of way. Both Ramseys and Mrs. Lotts swore that it was Mr. Ramsey, Sr., not Mr. Shellans, who suggested the second condition of the contract, that purchaser will retain current rights of way to the property. We also have their uncontradicted explanation that the term rights of way was used because two pieces of property, belonging to different individuals, had to be crossed to gain access to the property from Route 605. There is the testimony of Ramsey, Jr. and Lotts that while working on the contract at the office Shellans said nothing concerning the logging road; instead his attention was focused solely on the amount of river frontage and his desire to purchase by the acre. Lastly, we have Mrs. Lotts' testimony that her notes of her October 31, telephone conversation with Mr. Shellans reflect that one of the things he wanted was to have the, "Current right of way from the road to the river in the deed."

After a careful review of all the evidence presented in this case the court is unable to hold that the defendant has shown, by a preponderance of the evidence that the plaintiff's agents represented the logging road as a right of way to the property. Even assuming that the court did hold that the logging road had been represented to the defendant as a right of way, this court would have to hold that the defendant has not shown the misrepresentation to be a material fact inducing him to enter into the contract. It was stipulated by the parties that Mrs. Lanum could produce a bona fide right of way from Route 605 to the river. There was also evidence that there was a road on the property itself, albeit in need of repair, that provided access from the lower to the upper portion of the property. Thus the defendant had a way, other than the logging road, in which to reach the upper portion of the property. Since there was evidence that the defendant knew the logging road was not traversable by jeep, it is reasonable to infer that the logging road

and the road on the property itself were in equal states of disrepair and therefore would require equivalent expenditures of money to make them passable. At the very least, the defendant had an alternate route to the upper portion of the property over a road in an equal state of disrepair. This fact, coupled with the testimony of everybody, including the defendant, that Shellans' primary concern was with how much river frontage he was buying leads this court to the conclusion that even if a misrepresentation was made it was not a material fact inducing the defendant to sign the contract.

Having attached liability to the defendant, it now becomes incumbent upon the court to ascertain the degree to which the plaintiff was injured by defendant's breach. When the closing did not take place on April 1, 1980, the plaintiff's attorney, Shuler A. Kizer, wrote the defendant's attorney, Wilson Miller, regarding the plaintiff's plans to sell the property at public auction in order to mitigate the damages. As evidenced by Mr. Miller's letter of April 22, 1980, (Defendant's Exhibit # 4) Mr. Miller forwarded a copy of Mr. Kizer's April 1, letter concerning the auction to Mr. Shellans. Mr. Miller's April 22, letter indicates that Mr. Shellans did not receive the copy of Mr. Kizer's letter immediately but did receive it 4 or 5 days before the April 26, 1980 auction. Mr. Shellans did not attend the auction and he instructed Mr. Miller not to attend. Three hundred handbills advertising the auction were printed. Some of the handbills were posted along the banks of the Pedlar river and on the property itself one week prior to the opening of trout season and some were handed out to fishermen and campers on the opening day of trout season, which was approximately April 5, 1980. Plaintiff also placed a notice of the auction in the Amherst County newspaper on April 17 and 24, 1980, both within ten days of the auction. This was the only advertisement utilized by the plaintiff despite the testimony of the plaintiff's own expert witness, Gary Jennings, that there are four other newspapers commonly in cir-

culation in the area where the property is located. Mr. Jennings testified that the average length of time between booking a sale and the auction for his auction business was at least thirty days, with advertisements beginning at least two weeks before the auction date. He said that the newspaper advertisements and the handbills used in this case are in keeping with the type of advertisement used in the Amherst area. He further testified that radio and television advertisement were not effective in this kind of sale and that the crowd for this type of sale varies from three to three hundred depending on the appeal of the property.

The auction was held as scheduled on a rainy April 26, 1980, on the property with approximately twenty people in attendance. The auction was conducted by plaintiff's attorney, Mr. Kizer. The auction consisted of only two bids with Mr. Ramsey, Sr. making the opening bid of $40,000.00 and Mrs. Lanum's husband making the final and winning bid of $45,000.00. Although Mr. Lanum was the highest bidder, he signed nothing at the auction, he has tendered no payment for the property, and the property has never been deeded to him. In actuality, a contract of sale was made when the property was knocked out to the high bidder, but no conveyance of title has yet taken place.

The defendant had the property appraised by his expert witness, Mr. Frank B. Daniels, of John Stewart Walker, Inc. Mr. Daniels assigned a fair market value to the property of $72,300.00, assuming it had two rights of access, and $62,750.00 assuming it had only one point of access. When Mr. Ramsey, Jr. was asked if he thought $45,-000.00 was a fair price for the property he responded, "That's not a fair market value price." When his father was asked the same question he responded, "Well, an auction sale, that's probably par for the course that something would bring at an auction unless someone really wants it. Unless someone really wants it, property never brings market value at an auction, very seldom anyway."

It is clear in Virginia that the general purpose of the law, in fixing the amount of damages for the non-performance of a contract, is to give such compensation as will put the plaintiff in the same position in which he would have been had the defendant kept his contract. *Barr v. MacGlothlin*, 176 Va. 474, 11 S.E. 617 (1941). In this case, as in the instant action, where the vendor sells the property to another and brings an action against the vendee for damages for breach of the contract:

> . . . generally the measure of his damages is the difference between the contract price and the salable or market value of the property at the time of the breach, against which the vendee is entitled to credit for any sums paid by him on the purchase price. The vendor has no authority to make a resale of the property for the account of and at the risk of the vendee, or power to fix conclusively the amount of damages by making a resale of the property. But the amount received therefor at a resale, public or private, fairly made within a reasonable time after the breach, is admissible upon the question of the salable or market value of the property at the time of the breach; and, where the first sale was at public auction and the second sale is also made at public auction, after proper advertisement and notice to the vendee, under proper conditions, and upon the same terms or not less favorable terms than those upon which it was sold to the vendee, the price received at the second sale establishes prima facie, though not conclusively, the salable or market value at the time of breach.

*Definite Contract Building & Loan Association v. Tumin*, 158 Va. 771, 164 S.E. 562, 566 (1932).

Thus the court, in fixing damages, is faced with two questions. The first is, was the public auction of April 26, 1980, conducted in a reasonable and fair manner as to the defendant, i. e. proper advertisement and notice, under proper conditions, et cetera? If this is found to have been done the next question is, has the defendant presented evidence to show that the auction here

has not established the salable or market value of the property at the time of the breach?

 The auction here was conducted in a fair and reasonable manner as to the defendant. The notice given Mr. Shellans was adequate and the mode of advertisement employed was reasonable and conformed with the type of advertisement customarily used for auctions in the Amherst County area. The court finds, however, that the defendant has shown that the auction price of $45,000.00 does not fairly represent the salable or market value of the Byers property. The court was impressed with several factors in reaching this decision. The auction, held on a rainy day, was poorly attended, and in fact, solicited only two bids. Mrs. Lanum still owns the property in that no conveyance of the property has taken place, moreover no payment whatsoever has been made on it. We also have statements by Ramsey, Jr. and Sr., both experienced real estate brokers, indicating that an auction price rarely rises to the level of market value. Lastly the court has expert testimony that the market value of the property, with one access, is $62,750.00. The court adopts this figure as the market value of the property for purposes of determining the appropriate judgment to be awarded plaintiff. Plaintiff will be awarded judgment in the amount of the contract price, $84,888.00, minus the market value, $62,750.00, less the $500.00 deposit defendant paid toward the purchase price.

This Memorandum Opinion will be accompanied by an Order entering judgment for the plaintiff in the amount of $21,638.00 together with interest at the legal rate accruing from the date of the Order.