245 N.J. Super. 378 (1991)
585 A.2d 967
JOHN KUHN AND MARLENE KUHN, PLAINTIFFS-APPELLANTS,
v.
SPATIAL DESIGN, INC., STERLING NATIONAL MORTGAGE COMPANY, INC., STANLEY ELLBERGER AND WILLIAM WOLF, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 5, 1990.
Decided January 23, 1991.
*380 Before Judges LONG, R.S. COHEN and STERN.
David J. Haber, attorney for appellants.
Giordano, Halleran & Ciesla, attorneys for respondent Spatial Design, Inc. (Michael J. Canning on the brief).
Brown & Michael, attorneys for respondents Sterling National Mortgage Company, Inc., Stanley Ellberger and William Wolf (G. Michael Brown of counsel and Carol L. Cox on the brief).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
Plaintiffs John and Marlene Kuhn contracted to buy a home from defendant Spatial Design, Inc. The sale was contingent on the Kuhns' obtaining a mortgage to finance the purchase. They applied to Prudential Home Mortgage Company through a mortgage broker, defendant Sterling National Mortgage Company, Inc., with the help of Sterling employees, defendants Ellberger and Wolf. Prudential issued a mortgage commitment but later withdrew it. The Kuhns then sought to void their purchase contract with Spatial Design for failure of the mortgage contingency. When they did not get their deposit back, they started suit. Spatial Design counterclaimed for damages for breach of contract.[1] Judge Patrick J. McGann, Jr., heard the matter and found that the Kuhns had breached. He therefore denied their claim and awarded Spatial Design damages on the counterclaim. We affirm substantially for the reasons expressed in Judge McGann's oral opinion of March 22, 1990, in which he meticulously and thoroughly expressed his findings of fact and conclusions of law. There are two matters, however, on which we feel it would be useful to express our own views.
*381 Judge McGann concluded on compelling evidence that the Kuhns and Sterling's people purposely submitted a mortgage application that presented a materially false picture of the Kuhns' income and assets, because they knew that revealing their true financial situation would not produce the loan they sought. The judge further found that the Kuhns and Sterling were encouraged to submit such an application by Prudential's dependably credulous way of dealing with income and asset information submitted to it.
The Kuhns knew that their application showed that Kuhn was an Air Force colonel, but did not reveal that he had already been approved for retirement; that Mrs. Kuhn had a substantial income from "Plants-R-You," a florist business which existed only in the minds of the Kuhns and Sterling's people; that the fictitious business had assets of $50,000, which did not exist at all; that the $50,000 deposit on the purchase came from savings, when in fact it was borrowed on a second mortgage on the Kuhns' present home, and that the Kuhns had jewelry, antiques, stamps and the like worth $123,000, which Kuhn actually thought would fetch some $47,000.
Kuhn knew that his true current income and assets would not support the mortgage application. He and his wife also knew that Wolf had left some figures blank in the application they signed. Wolf had said they were not going to be "boy scouts" in the matter. Predictably, Sterling's president, Ellberger, who knew what numbers it took to make the application viable, supplied some impressive ones. They showed bank balances of some $240,000 instead of the real $10,000, and total family income of some $218,000 instead of the real $65,000 or even the fictitious $95,000 that earlier appeared. Not surprisingly, Prudential issued a commitment for a $300,000 mortgage for the $515,000 purchase.
All of this was possible because the Kuhns were making a "no documentation" loan application. That meant that Prudential would probably not check to see if the represented facts *382 showing the career Air Force officer's improbably comfortable financial situation were true.[2]
Colonel Kuhn expected the whole business to be ultimately supported by a high-salaried but not-yet-identified private sector job he hoped to find before he retired. The $30,000 in income he thought was going to be attributed to "Plants-R-You" (Ellberger eventually settled on $9400 per month.) was really his Air Force pension. The $65,000 he thought he showed as service income (Ellberger made it $8800 per month.) would be covered by the private sector job he had not yet sought.
When Kuhn put the present home up for sale and looked for a private sector job, he found both the real estate market and the job market unwelcoming. He heard that Spatial Design might have sold the house across the street from their new one for much less than they were paying. He therefore decided to climb down from the shaky limb he was on.[3] He telephoned Prudential and wrote to Sterling, stating that he had decided to retire from the Air Force, and would thus lose some $40,000 in annual income. He inquired innocently if that would affect the mortgage commitment.
Almost simultaneously, Kuhn wrote to the Air Force to withdraw his approved retirement, thus falsifying the sole expressed basis of his communications with Prudential and Sterling.[4] Prudential withdrew its commitment on the basis of *383 the new information. It had retained the right to withdraw "if any material facts appear that have not previously been revealed by [the applicant]." Kuhn then unsuccessfully tried to cancel the purchase contract on the thesis that the mortgage contingency was not satisfied.
The Kuhns sued Spatial Design, which counterclaimed for the deposit and damages. They then sued Sterling, Wolf and Ellberger for indemnification against the counterclaim. Spatial Design crossclaimed against Sterling, Wolf and Ellberger for fraud, tortious interference, conspiracy and negligence.
After a bench trial, Judge McGann found in favor of Spatial Design and against the Kuhns, and assessed damages at almost $100,000, less the retained deposit of $50,000. He denied the Kuhns' indemnification claim and Spatial Design's damage claim against the mortgage brokers.
Spatial Design has not crossappealed from the denial of its damage claim against the mortgage brokers. We therefore do not comment on it.[5] In all respects material to this appeal, however, Judge McGann's findings and conclusions on the conduct of the parties are supported by compelling evidence. We have considered his conclusions that as wrongdoers the Kuhns are not entitled to indemnification, and that whatever limited knowledge the Kuhns' real estate broker Flo Pulda had about the mortgage application was not attributable to Spatial Design. Those conclusions were factually supported and legally sound.
*384 Now, as to damages. The contract price was $515,000, subject to a real estate commission of 5% or $25,750. The house was eventually sold, free of commission, for $434,000. In the interim, there were carrying charges for taxes and interest. There was no reason suggested by the evidence to doubt the reasonableness either of the time it took to resell the house or the sale price obtained.
Damages arose from two different sources. The first was the decreasing value of the house due to general market conditions. The second was the cost of holding the house until it could be resold. The holding costs are not the subject of this appeal. The Kuhns have two arguments, however, about the loss-of-value damages.
The first argument is that the true measure of a seller's damages for breach of contract by a buyer of real estate is the difference between the contract price and the market value at the time of the breach, less credit for any deposit retained by the seller. The Kuhns cite Ruane Dev. Corp. v. Cullere, 134 N.J. Super. 245, 251, 339 A.2d 229 (App.Div. 1975), and Oliver v. Lawson, 92 N.J. Super. 331, 335, 223 A.2d 355 (App.Div. 1966), certif. denied, 48 N.J. 574, 227 A.2d 133 (1967). They point out that if values were steadily declining, as the judge found, they had declined very little in the few months between contract and breach, and certainly much less than at the time of resale, many months later. Thus, the Kuhns argue, it was error to measure Spatial Design's damages by the difference between the two contract prices.
Neither of the cases cited by the Kuhns involved the assessment of damages resulting from a breach in a falling market. In such circumstances, two basic rules must be consulted. One is that contract damages are designed to put the injured party in as good a position as if performance had been rendered as promised. The other, from Hadley v. Baxendale, is that damages should be such as may fairly be considered either arising naturally, i.e., according to the usual course of things, from the *385 breach, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they contracted, as the probable result of the breach. Donovan v. Bachstadt, 91 N.J. 434, 444-445, 453 A.2d 160 (1982).
In the usual course of things, a $515,000 house cannot be resold the instant a contract buyer breaches, and a reasonable time for resale must therefore be allowed. In addition, it is not uncommon for property values to experience a general fall-off after a period of intense run-up. In a falling market, buyers take longer to find, and they buy at reduced prices.
A rule that restricts damages for breach of a contract to buy real estate to the difference between contract price and value at the time of breach (plus expenses) works fairly only in a static market. A damage rule works fairly in a declining market only if it takes account of slowing sales and falling values. In such cases, where the seller puts the property back on the market and resells, the measure is not contract price less value at the time of breach, but rather the resale price, if it is reasonable as to time, method, manner, place and terms. These are matters for the factfinder, who may or may not conclude from the evidence that what actually occurred after breach by way of resale was reasonable and thus provides an accurate measure of damages. Judge McGann found that it did here, on sufficient credible evidence.
We adopt,[6] for these purposes, the essence of the sellers' damage rules provided for sellers of goods in the Uniform Commercial Code, N.J.S.A. 12A:2-706 and 708, and adapted for sellers of real estate in §§ 504-507 of the Uniform Land Transactions Act (ULTA), which New Jersey has not adopted. We adopt these rules because they take account of the effect of *386 changing market conditions in sound ways which New Jersey's reported decisions have not yet taken into account.[7]
Where a buyer of real estate wrongfully rejects, repudiates or materially breaches as to a substantial part of the contract, the seller may resell in a manner that is reasonable as to method, manner, time, place and terms. The defaulting buyer must have reasonable notice of the time after which resale will take place. If the resale is a public sale, the defaulting buyer must have notice of the time and place, and may buy. The seller may then recover the amount by which the unpaid contract price and any incidental and consequential damages exceed the resale price, less expenses avoided because of the buyer's breach. See ULTA § 2-504, 13 U.L.A. 552 (1977); N.J.S.A. 12A:2-706.
A seller's incidental damages include any reasonable out-of-pocket expenses incurred because of the buyer's breach. A seller's consequential damages include any loss the buyer knew or at the time of contracting had reason to know would result from the buyer's breach and which reasonably could not be avoided by the seller. See ULTA § 507, 13 U.L.A. 555 (1977).
The case may be different where the seller does not put the property back on the market. In such a case, the measure of the seller's damages is the amount by which the unpaid contract price and any incidental and consequential damages exceed the fair market value of the property at the time of breach, less expenses avoided because of the buyer's breach. See ULTA § 2-505(a), 13 U.L.A. 553 (1977) (using the value at the time set for conveyance instead of at the time of breach); see also N.J.S.A. 12A:2-708(1). Without a resale, value at the time of breach is used, even in a declining market, because the *387 choice of any other time would be so speculative. We need not explore application of the exceptions made by ULTA 2-505(b) and N.J.S.A. 12A:2-708(2) for situations in which the difference between contract price and fair market value is inadequate to put the seller in as good a position as performance would have.
The Kuhns' second argument relates to real estate commissions. Their position is that if the seller's damages are to be measured by the difference in sales prices, it should not be gross contract prices, but rather the net difference after deduction of the real estate commissions that were payable on the sale to them, but not on the subsequent lower-price resale.
The proper answer is found in the parties' positions vis-a-vis the realtors after the litigation is over. If the seller is obligated to pay the realtors after recovering damages from the Kuhns, then the seller's obligation to the realtors should be considered part of its damages and should be included in its recovery. On the other hand, if it is the buyers who will have to pay the realtors, then not deducting it from the seller's damages will result in the buyers' paying the commissions twice and the seller's retaining a windfall. The problem here is that both parties are liable to the realtors.
If the realtors were parties to this lawsuit, the necessary rulings could be made within it. If they were plaintiffs, they would seek commissions from both buyers and seller, who would crossclaim, and responsibilities could ultimately be fixed. If the realtors were sued by the Kuhns or Spatial Design, they would counterclaim for commissions, and the same procedural scenario could be played out. If they were parties, but did not assert any claim for commissions, they would be barred by the single-controversy rule from doing so later. Thus, the buyers and seller could have their obligations to each other determined without the uncertainty of a possible surviving obligation to the realtors.
We cannot resolve this case in that way. We do not know if one or the other of the parties here has already made peace *388 with the brokers, of if there is an existing or threatened action for commissions. We do know, however, something about the potential liabilities of the parties from Rothman Realty Corp. v. Bereck, 73 N.J. 590, 376 A.2d 902 (1977), and Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 236 A.2d 843 (1967).
Those cases stand for the following propositions: a seller owes a realtor's commission not on the contract but on the actual closing of the sale. If there is no closing, through no improper or frustrating conduct of the seller, but as the result of the inability or fault of the buyer, the seller owes no commission even though the realtor may have performed its every function. The buyer, on the other hand, ordinarily has no obligation to the realtor with respect to a consummated sale or a sale that aborts through no fault of the buyer. The buyer, however, ordinarily knows that the realtor stands to earn a commission from the seller. And so the law implies a promise from the buyer to the realtor[8] to complete the transaction with the owner. If the failure of the sale to close results from the improper or frustrating conduct of the buyer, and the buyer thereby violates the contract with the seller and the implied contract with the realtor, the buyer becomes obligated to the realtor for the commission the realtor lost.
If the seller loses the deal as the result of the wrongful conduct of the buyer, and thus owes the realtor no commission, the seller has no duty to the realtor to sue the buyer for damages or for specific performance. If, however, the seller sues the buyer and recovers substantial damages as the equivalent of performance by the buyer, the seller is deemed to have accepted the benefit of the realtor's services, and is liable for the commission.
*389 Here, Spatial Design recovered from the Kuhns nearly $100,000 in damages, including the contract deposit. Under Ellsworth Dobbs, Inc. v. Johnson and Rothman Realty Corp. v. Bereck, that is the substantial equivalent of performance by the Kuhns. Recovering it renders Spatial Design liable for the commission even though it was not at fault for the deal's falling through.
Although it is unclear if either Spatial Design or the Kuhns will ever have to pay the realtors, it is clear that they are both liable for the commissions and that the Kuhns, whose conduct created the liability, should be the ultimate source of the payment.
There are three possible outcomes. One is to deduct the commissions from Spatial Design's damages, on the ground of their uncertainty, but preserve a right to seek indemnification if the brokers ever sue. The second is to include the commissions in Spatial Design's damages, but preserve for the Kuhns a right to indemnification from Spatial Design against the possible future claim of the brokers against the Kuhns. The third possibility is to deduct the realtors' commissions from Spatial Design's recovery upon the Kuhns' offering to supply security to guarantee the future collectibility of an indemnification judgment against them in favor of Spatial Design in a form, an amount and for a duration sufficient in the view of the trial judge to protect Spatial Design from any reasonable exposure to realtors' claims.
Both parties are now exposed to a possible future liability. The right of each to indemnification from the other depends for its efficacy on the ability of the other to pay a judgment in the future. The risk that one party or the other will become judgment-proof should in fairness rest on the party whose wrongful conduct caused the problem.
We affirm the judgment below in all respects. We note, however, that the Kuhns will have a right to indemnification from Spatial Design if the realtors seek commissions from *390 them. We also note that the Kuhns will have the right to move in the trial court to reduce the judgment by supplying security as we have discussed.
NOTES
[1] Spatial Design did not seek specific performance.
[2] It is impossible to tell from the evidence if Prudential greeted improbable information in "no documentation" applications with a knowing wink, and counted on ever-rising property values to pick up the slack.
[3] The Kuhns' purchase was not conditional on the sale of their home. Instead, Spatial Design had agreed to provide a bridge loan of $185,000. The Kuhns could therefore have ended up with two homes, the Prudential mortgage, the bridge loan, and the first and second mortgages on their unsold other house, all to be satisfied out of a $30,000 pension.
[4] The reason he gave the Air Force was that the Air Force

ha[d] not yet been successful in identifying a replacement for [him] to carry on the leadership * * * in the vital work of developing joint and combined tactical C-3 interoperability architectures for the CINCs. * * * Without proper leadership, the quality and timeliness of this work is in jeopardy.
[5] We do note N.J.S.A. 17:11B-14g, which prohibits material misrepresentations, circumventions and concealments by mortgage brokers, and N.J.S.A. 17:11B-17, which makes willful violations third-degree crimes. We do not say whether these statutes create a cause of action, or whether the disappointed seller would have standing to sue.
[6] The Kuhn contract did not contain a liquidated damage clause, either forfeiting the deposit on the buyer's breach without proof of damages, or limiting liability of the buyer to the amount of the deposit. We do not intend by this opinion to affect the applicability or enforceability of such provisions.
[7] Cf. Sheehy v. Galipeau, 48 N.J. Super. 95, 102-103, 137 A.2d 5 (App.Div. 1957) (A reasonable resale price is prima facie evidence of market value in the admeasurement of damages.)
[8] Ellsworth Dobbs, Inc. v. Johnson dealt with the defaulting buyer's implied promise to the realtor who was engaged to find suitable property by the buyer with knowledge that a purchase would earn the realtor a commission from the seller. We are aware of no reason why the law should not imply the same promise to a listing realtor.