James T. **ROBINSON** and Florida Businessmen's Association, Inc., a Florida corporation, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 96–207 C.

United States Court of Federal Claims.

Sept. 17, 2001.

Ted H. Bartlestone, Hollander & Bartlestone, P.A., Miami, Florida, for plaintiff.

Brian S. Smith, with whom were Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, Assistant Director Robert Kirschman, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., and Audrey Goldman, United States Small Business Administration, for defendant.

## OPINION

WIESE, Judge.

In an opinion entered in this case on November 10, 1998 (unpublished), plaintiff was found liable for breach of a contract involving the purchase at auction of an improved parcel of real estate from the Small Business Administration ("SBA"). As part of that earlier proceeding, the Government had cross-claimed for $154,000, representing the difference between the original contract price and the price for which ·the property was later resold, less plaintiff's deposit. We denied the Government's motion for summary judgment as to damages, however, ruling that material issues of fact remained in dispute.

After unsuccessful efforts by the parties to resolve the damages issue on their own, the matter went to trial on June 19–20, 2001. The sole issue at trial was the determination of what damages, if any, were identifiable with plaintiff's breach. Having carefully considered the testimony presented, we find no evidence that the property declined in value between the date of its sale to plaintiff and the date of its resale, nor any evidence that the Small Business Administration took the steps necessary to resell the property in a commercially reasonable manner. Based on these factors, we conclude that a significant portion of the damages the Government now seeks cannot properly be identified with plaintiff's breach, and is therefore unrecoverable.

## BACKGROUND

Plaintiff purchased the property in question—a former restaurant in Lutz, Florida—at a government-sponsored auction in May 1993. The winning bid was $394,000, $39,400 of which was conveyed to the SBA as a down payment for the sale. Although a challenge to the property's title prevented the parties from closing on the date originally contemplated, plaintiff, under a later-reached agreement with the SBA, took possession of the property in August 1993.

As a result of the title defect and by mutual agreement, the closing date was postponed on three separate occasions. When the closing still had not occurred by April 1994, however, plaintiff notified the SBA of his intention to vacate the premises, and abandoned the property in May ·1994 (the action that gave rise to this court's breach determination). The SBA recovered the property, and began to make preparations for its resale by auction. Before the property was auctioned, however, the SBA received, via its realtor, a private offer for the property of $100,000, some $294,000 less than the

price plaintiff had bid 17 months before. The SBA refused the offer. The private offeror then made a second offer of $150,000, which too was refused. A final offer of $200,000 was tendered and finally accepted on November 28, 1994. The Government now seeks the difference between the $394,000 originally bid by plaintiff and the $200,000 it ultimately accepted for the property, less plaintiff's $39,400 deposit that the SBA has retained.

## DISCUSSION

▮ In an action for the breach of a real estate contract to sell, damages are traditionally measured by the difference between the contract price and the market value of the property at the time of breach. 14 R. Powell & P. Rohan, Powell On Real Property § 81.04[2][b] (Michael Allan Wolf ed.2000); 5 Arthur Linton Corbin, Corbin on Contracts § 1098A (1964). In the event that the fair market value of a property declines in the interim between breach and resale, that loss may nonetheless be charged to the breaching party in an effort to make the non-breaching party whole. 2 Milton R. Friedman, Contracts and Conveyances of Real Property § 12.1(a) (6th ed.1998) (citing *Kuhn v. Spatial Design*, 245 N.J.Super. 378, 585 A.2d 967 (1991)).

▮ As with any contract damages, however, an injured party can recover only those sums attributable to the breach, and not those amounts arising from its own failure to mitigate its damages. Restatement (Second) of Contracts § 350 (1979). This so-called duty to mitigate prevents the breaching party from being charged with damages that the non-breaching party, through reasonable effort and without undue risk or expense, could reasonably have avoided. *See generally*, 5 Corbin, *supra*, § 1039. The breaching party thus bears the burden of demonstrating that the Government could have mitigated its losses through reasonable

effort and expense. *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. 164, 166 (1990).

▮ The duty to mitigate, however, does not require the Government to hold out for the property's highest value or to seek out the optimum conditions for the property's resale. *Id.* So long as the Government acts reasonably, the breaching party bears the risk both of changing market conditions and of a decline in price resulting from the conditions associated with the property's resale (*e.g.*, by auction rather than by extensive marketing). At the heart of our inquiry, then, is the question of whether the SBA's resale of the property in November 1994 was conducted in a reasonable and fair manner.

### I.

▮ In assessing the reasonableness of the Government's actions, we begin with two central features of the property's resale: the fact that the property was sold for 50% of the value it had commanded only 17 months earlier, and the fact that it was sold privately and without an updated appraisal. At trial, plaintiff presented evidence that the resale price was substantially lower than the property's fair market value, and further, that the agency failed to take the steps it could reasonably have taken to avoid incurring additional damages. That latter fact, plaintiff maintains, prevents the SBA from recovering any damages its reasonable efforts would have allowed it to avoid. We address those issues in turn.

### Fair Market Value

In attempting to discern the property's fair market value at the time plaintiff abandoned the site, we note as an initial matter that the Government made no effort to establish the property's value at the time of breach.[1] It did not call an appraiser of its own, nor did it offer any testimony as to the value of the property in May 1994. The only

---

1. While it is true that the amount received for the property at resale can be used as an approximation of value in the absence of evidence establishing the market value at the time of the breach, application of that rule is contingent on the subsequent sale's being fairly made and within a reasonable time of the breach. 14 Powell, *supra*,

§ 81.04[2][b], at 81–184; *Lanum v. Shellans*, 523 F.Supp. 326, 332–333 (W.D.Va.1981). Where more than a year has elapsed between the breach and the resale, courts have held that the resale price does not, on its face, establish the breach value. *See, e.g., Nielsen v. Farrington*, 223 Cal. App.3d 1582, 273 Cal.Rptr. 312, 315 (1990).

evidence presented on the question of valuation was a newspaper clipping suggesting that the values of undeveloped land had continued to plummet in 1994. But as the article was both unattributed and undated, and dealt with undeveloped land rather than improved commercial properties, we find it at best of dubious relevance.

Plaintiff, in contrast, offered extensive evidence that the value of the property was unlikely to have declined between the date of the auction and the date either of plaintiff's breach or of the property's resale. Plaintiff's expert and chief witness, Christopher LaFrance, was the appraiser who had been commissioned by the Government to conduct an appraisal of the property immediately prior to the auction in May 1993. In that May 1993 appraisal report, Mr. LaFrance estimated the property's fair market value at $465,000; its quick sale value (the amount expected if the property's market exposure is limited to 6 months to a year) at $400,000; and its liquidation value (the amount expected if the property is sold without reasonable market exposure, usually within 6 months) at $325,000. As noted above, the property was then sold to plaintiff at auction, that same month, for $394,000.

Asked by plaintiff to perform a retrospective analysis of the value of the property during the period in question, Mr. LaFrance consulted five comparable properties to ascertain whether, in his expert opinion, the real estate market for restaurants had declined appreciably from 1993 to 1994. Based on his findings, he testified at trial that he did not believe that the market had continued its downward slope, but rather that the real estate market may in fact have begun to experience a turn-around after depressed real estate prices in 1991, 1992 and 1993. In addition, Mr. LaFrance testified that the planned widening of the road on which the property was located from two to four lanes (a circumstance that in fact came to pass), would have had a positive impact on the property's value—further evidence, in his view, that the property's value, at minimum, would not have declined during the 1993–1994 time-frame.

In lieu of calling its own appraiser, the Government offered a number of objections to Mr. LaFrance's methodology. Noting that Mr. LaFrance had not reappraised the property—and hence had failed to establish its actual value for 1994, the Government challenged his conclusions about the market trends on the grounds that the comparison properties Mr. LaFrance had chosen to rely on were not truly comparable (direct alternative purchases); and that Mr. LaFrance's conversations with individuals at those properties could hardly provide an informed or scientific basis for reaching his market conclusions.

In response to those criticisms, Mr. LaFrance acknowledged that his retrospective analysis did not constitute a reappraisal, but explained that an appraisal, which would have required a contemporaneous examination of the property, was not something that could, by definition, be done after the fact. He further explained that the identification of market trends affecting a property's value is a commonplace assignment for an appraiser, and that the consultation of nearby property owners represents a primary tool in establishing those trends. Mr. LaFrance conceded that the "comparables" (*i.e.*, other real estate properties considered for the purpose of comparison with the subject) on which he relied were, for various reasons, less than ideal, but testified that he was confident in the conclusions he drew from them, and that they were in complete conformance with industry practice.

Indeed, the Government's criticisms of Mr. LaFrance's methodology seemed more properly directed at industry practice and at the field of appraising as a whole (an area in which Mr. LaFrance's expertise went unchallenged), than at the particulars of his 1994 market analysis.[2] And as the Government took no issue with Mr. LaFrance's 1993 appraisal, and its accuracy was born out by the

---

2. In his closing argument, defendant's counsel indeed explained that "the bottom line here is that real estate appraisals in general don't appear to be all that objective or even scientific. . . . Frankly, I don't believe that's a terribly competent way to go about ascribing values to real estate." He conceded, however, that "[i]t apparently is the way it's done."

later purchase price, we find no reason to discredit Mr. LaFrance's testimony on the grounds the Government offered.

In the absence of any government evidence to the contrary, then, and in light of Mr. LaFrance's compelling testimony, we indeed find that restaurant real estate prices are likely to have stabilized, if not actually increased, during the period in·question. Mr. LaFrance's familiarity with the property and with the local real estate market as a result of his 1993 appraisal make him uniquely qualified to address changes in that market during the subsequent 17–month period. And the fact that Mr. LaFrance's earlier work had been commissioned and accepted by the SBA, and that his estimates had been confirmed by the market price the property commanded,[3] suggest a level of expertise that we believe extended to his courtroom testimony. Accordingly, we adopt as our own Mr. LaFrance's conclusion that the decline in price between the property's sale and its resale was not properly attributable to market forces.

Nor was evidence offered at trial to suggest that the property itself had suffered any damage to explain a decline in its value independent of market conditions. The Government's allegation that the interior of the property was "trashed," for instance, even if proven,[4] should not have had an effect on the property's resale value. That was the case, first, because the interior furnishings and fixtures were not included in the $394,000 price paid by plaintiff, but were sold to him in a separate transaction, and second, because Mr. LaFrance had not assigned a value to the interior in his appraisal estimates.[5] Thus, both the original purchase price and the appraisal estimate reflected a "shell" value—the value of the land and the building without regard to the interior.

Absent a showing, then, either that the market declined during the period between the sale to plaintiff and the resale, or that the property itself suffered damage that would have decreased its value, we think a 50% decline in price over a 17–month period is too precipitous a drop not to require further explanation. We turn then, to the Government's efforts to resell the property.

### Efforts at Resale

As discussed above, the Government, despite an original intention to resell the property at auction, decided instead to dispose of it by private sale. As a consequence, none of the traditional methods for attaining fair market value—market exposure, competitive sale etc.—were achieved. This failure would not in and of itself have been unreasonable, perhaps, except that the SBA, by its own admission, was not aware of the property's value, and did nothing, despite the discrepancy between the sale and resale values, to ensure that the price offered was in the competitive—or even reasonable—range.

Mr. Gallman, the SBA liquidation specialist assigned to dispose of the property, testified that he could not recall any discussion with his superiors or with the auction house about the general state of the real estate market at the time of resale. When asked by the court to clarify that point, i.e., specifically what, if anything, was said about the state of the real

---

3. Mr. LaFrance and Mr. James T. Gallman, a liquidation expert at the SBA, both testified that the sale of a property at auction regularly results in a price lower than the property's true market value. The $395,000 received at auction, however, was within 98.75% of Mr. LaFrance's $400,000 estimate for quick sale value (defined as market exposure of 6 months to a year), a coincidence of values Mr. LaFrance described as "right on the money."

4. The Government's allegation that the property was in an unreasonable state of disrepair was not supported by the record. The SBA liquidation specialist assigned to the case—James T. Gallman—testified that he had not investigated the interior of the property after plaintiff's departure,

and the property was in fact described in a July 26, 1994, SBA internal notation as being in "good shape." Estimates provided to the Government anticipated the need for only minimal repairs—on the order of $1450, including $550 in cleaning costs/ shrub maintenance. Finally, the testimony regarding a broken air conditioning unit on the roof—damage which likely occurred after plaintiff's departure—proved inconclusive.

5. Mr. LaFrance's decision not to assign value to the property's interior was based on his conclusion that the interior was "super adequate"—an appraisal term to describe additional features that exceed those for which the market would be willing to pay.

estate market at the time of resale, Mr. Gallman testified "I don't recall if there was anything specific about the market."

While there was a disturbing absence of documentation for the 1994 sale (in contrast to the 1993 sale), the evidence suggested that the SBA was not only unaware of the property's value, but that any sense it had for that value was based on erroneous information. The eventual purchaser, for instance, first informed the SBA that the cost of repairs would well exceed $200,000, and on that basis offered a bid price of $100,000. He later increased his offer to $150,000, this time estimating $150,000 in necessary expenditures to make the property useable. In response to the second offer, Sharon Moye, the vice-president of the auction house the SBA had employed to dispose of the property, wrote to Mr. Gallman on November 3, 1994:

> If you add the $150,000 offer to the amount of estimated repairs, [the private offeror] is offering $300,000 for the property. It is calculated he will have to budget for unforeseen code enforcement, and cost runovers.... In its present condition this property will deteriorate quickly, and, obviously, decrease in value. A buyer with the ability to close with cash quickly is the most cost effective solution protecting the return on this asset.

In contrast to the amount of repairs predicted by the private offeror, and on which the successful bid was predicated, an estimate provided to the auction house anticipated the amount to be a mere $1450, including $550 in cleaning costs/ shrub maintenance. The private offeror himself spent $61,401.04 (far short of the $150,000 predicted), a significant portion of which represented renovation rather than repair. Nevertheless, when asked whether it was on the basis of "those repair estimates [that] the SBA recommended or justified the recommendation of approving the sale ... for $200,000," Mr. Gallman confirmed that it was that consider-

ation which governed his decision to accept the private offer.

The fact that the SBA based its decision to sell on erroneous information flowed directly from the fact that it had done nothing to determine the property's fair market value, and thus had no basis for realistically assessing the reasonableness of a particular offer. Indeed, the SBA's internal regulations highlighted the importance of assessing a property's value before sale:

> In order to establish and maintain realistic offering and selling prices for colpur [collateral purchased], it is important that the liquidation officer keep apprised of the colpur's changing value. In some areas, local market conditions may be subject to wide swings. Further, it is important to document the changes in colpur value which may occur during extended litigation. Accordingly, all colpur shall be appraised at least annually. More frequent appraisals may be appropriate in certain cases.

SBA Loan Liquidation and Acquired Property Procedure, 50–51–1 at 235 (July 1993).

Later versions of those procedures—although obviously not binding on earlier transactions,[6] are nonetheless instructive as to the SBA's position, and express that preference in no uncertain terms:

> [the liquidation specialist] must justify all negotiated sales or listing prices with a recent appraisal (preferably within 120 days, but no older than a year) of the property or other reliable indication of value (such as an opinion by a qualified broker in situations where prices can be readily ascertained because of similar property sales in an active market).... Only in rare circumstances should an appraisal older than 1 year be used and must be documented by a 327 action.

SBA Standard Operating Procedures for Appraisals, Collateral Purchased by SBA and Lender and Contracting with Auction Firms at 8(b)(iii).

---

6. In addition to the fact that later-promulgated procedures clearly do not govern earlier transactions, the procedures were not "binding" in the sense that a failure to comply with them would not alone have proven that the Government acted unreasonably. The duty to mitigate, in other

words, is not a duty to follow internal regulations. The fact that the SBA required appraisals so emphatically, however, underscores the need for informed valuation in reasoned sales transactions.

In light of those instructions, we read defendant's contention that the appraised value of the property had been on the decline since 1991 [7] not as evidence that a 50% decrease in value over a year's period was to be expected, but as evidence that an appraisal under such potentially volatile market conditions was even more critical. Accepting, as the SBA did, so depressed a price without either opening the sale up to competition or, at minimum, confirming that the price was at least reasonable, made the agency vulnerable to the very circumstance that came to pass: the sale of a property for significantly less than the value it could reasonably have been expected to command.

Plaintiff in fact offered evidence that the Government indeed could have obtained a higher price for the property. The May 1993 auction attracted 25 registered bidders, all of whom were required to put up a refundable $10,000 in order to participate in the auction. Of those, one unsuccessful bidder contacted the SBA in a letter dated May 26, 1993, reiterating his interest in the property and asking that he be contacted should the auction offer be refused.

We do not mean to suggest, however, that the agency was required to contact the original bidders, that it was required to commission an appraisal or that it was required to conduct an auction. But without some verification that the price offered was a reasonable one—either through competitive bidding, through an appraisal, or through some independent analysis of market trends-the SBA could not have made an informed judgment about whether to accept that offer. The fact that the evidence suggests the SBA could in actuality have obtained a higher price, and that the basis for their decision to sell was later proved in error, merely confirms the unworkability of their sales approach. And while the SBA is free to sell its property for dramatically less than even its liquidated value, it may not in turn identify that unnecessary loss with plaintiff's breach.

## II.

Our conclusion that the Government took insufficient steps to mitigate its damages, however, does not mean that the damages it seeks are completely unrecoverable. As discussed above, the Government need not seek out the optimum conditions for resale nor hold out for the property's fair market value, but must only make those efforts that are fair and reasonable under the circumstances. *Ketchikan,* 20 Cl.Ct. at 166. Had the SBA reasonably apprised itself of the property's value, it could nonetheless have conducted a private sale more in-line with that value, or have conducted an auction to achieve no more than the property's quick-sale or liquidation values.

We thus think a more accurate value for the property—*i.e.,* the amount the Government, reasonably informed and with reasonable effort, should have raised—is $325,000, representing the appraised liquidation value of the property as of May 1993. Here we note two things: first, a liquidation value is the appropriate measure because the Government, as the injured party, is not required to seek anything more. Second, we find that particular liquidation value reliable because the validity of the 1993 appraisal was confirmed by the May 1993 sale. We do not believe that number requires modification because nothing in the record suggests either that market conditions or the condition of the property itself declined from May 1993 to November 1994.

The Government is thus eligible to recover the contract price of $394,000 less the value of the resale price it should have received—$325,000—reduced by plaintiff's $39,400 deposit. Judgment is accordingly for the Government in the amount of $29,600.

## CONCLUSION

In this case, the Government has urged us to find that both the price received for the

7. An appraisal of the property conducted in 1990 estimated the fair market value at $740,000; Mr. LaFrance's appraisal in 1993 set the fair market value at $465,000. Defendant pointed to that decline (and several decreasing offers to purchase in the interim) in support of its contention that $200,000 was a reasonable offer. As discussed above, however, the evidence at trial suggested that the real estate prices, depressed since 1990, had leveled off, if not actually begun to rise, by 1994.

property at resale and the efforts made by the SBA to resell it were reasonable. For the reasons discussed above, we can conclude neither. At minimum, a seller of property must be informed as to what it is selling, a central feature of which is the property's value. To sell property without any knowledge of that information, and to sell it for substantially less than it had recently commanded, without explanation for the decrease, is to act unreasonably. The Government may therefore recover only those damages identifiable with plaintiff's breach, and not those resulting from the Government's failure to mitigate its damages. Accordingly, the clerk is instructed to enter judgment for defendant in the amount of $29,600. No costs.