James T. ROBINSON and Florida Businessmen's Association, Inc., Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 02–5028.

United States Court of Appeals, Federal Circuit.

DECIDED: Sept. 24, 2002.

Ted H. Bartelstone, Hollander & Bartelstone, of Miami, FL, argued or plaintiffs-appellants.

Brian S. Smith, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; and Robert E. Kirschman, Jr., Assistant Director.

Before NEWMAN, MICHEL and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge MICHEL. Dissenting opinion filed by Circuit Judge PROST.

MICHEL, Circuit Judge.

Plaintiffs appeal from a judgment of $69,000 in damages for their breach of a contract to purchase a restaurant and surrounding land from the Small Business Administration ("SBA"). They do not contest their liability, only the amount of damages awarded. The United States Court of Federal Claims rejected the government's damages request because of the government's failure to mitigate. *James T. Robinson and Florida Businessmen's Ass'n, Inc. v. United States*, 50 Fed.Cl. 368 (Fed.Cl.2001). The government sought the difference between the $394,000 contract price and the $200,000 post-breach sale price, less the plaintiffs' $39,400 deposit. After a trial on damages only, the court found, however, that the proper measure was $69,000, the difference between

the contract sale price of $394,000 and the undisputed liquidation value of $325,000.

We conclude that, in holding that the government need not take affirmative steps or make reasonable efforts, but could instead mitigate by passively accepting the liquidation value, the trial court applied an erroneous legal standard. Further, applying the correct legal standard to the undisputed facts, we hold as a matter of law that no damages are due. This is so because if reasonable efforts had been made, the quick sale value of $400,000 would have been realized. We therefore reverse the judgment of damages.

## I

■ Plaintiffs purchased a former restaurant and surrounding land in Florida at a government-sponsored auction in May 1993. Plaintiffs' winning bid was $394,000, $39,400 of which was conveyed to the SBA as a down payment for the sale. Because of a title challenge, the closing on the property did not occur as scheduled, and under a subsequent agreement with the SBA plaintiffs took possession of the property in August 1993. When the closing date had not occurred by April 1994, plaintiffs notified the SBA of their intention to vacate the premises and thereafter abandoned the property in May 1994.[1] The SBA then recovered the property but, before putting it up for re-auction, received a private offer for it. The SBA ultimately accepted the offer of $200,000, which was $194,000 below the contract price.

At trial plaintiffs presented evidence that property values in the relevant area at the time of the resale, while having initially declined, were in fact the same as they were at the time of the initial auction. Thus, the property's fair market value was $465,000; its quick sale value (the amount

expected if the property's market exposure is limited to six months to a year) was $400,000; and its liquidation value (the amount expected if the property is sold without reasonable market exposure, usually within six months) was $325,000. These facts are not disputed. (Indeed, the government called no witnesses after plaintiffs called the government's own appraiser of the property as its main witness.)

The trial court held that had the SBA acted "reasonably informed and with reasonable effort" it could have received the appraised liquidation value of the property. The court then awarded the government the difference between the contract price and the liquidation value, $69,000, less plaintiffs' $39,400 deposit (which the government already had)—net damages of $29,600. Plaintiffs appeal this damages judgment of $69,000. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

On appeal, the plaintiffs contend that the court applied the wrong legal standard in defining the duty of the government to mitigate when it held that achieving the liquidation value without taking any affirmative steps constituted sufficient mitigation, rather than taking such steps to obtain the higher quick sale value. Alternatively, plaintiffs urge that assuming the court applied the correct legal standard, it clearly erred in applying the standard to the essentially undisputed facts.

## III

■ Although the trial court initially stated the correct legal standard, it actually applied a different and erroneous one. First, citing *Ketchikan Pulp Co. v. United*

---

1. In November 1998 plaintiffs were found liable for breach of that contract and do not contest that finding of liability.

*States,* 20 Cl.Ct. 164, 166 (1990), the court stated the government "need not seek out the optimum conditions for resale nor hold out for the property's fair market value, but must only make those *efforts* that are fair and *reasonable* under the circumstances." *Robinson,* 50 Fed.Cl. at 374 (emphases added). The quoted statement, based on the *Ketchikan* opinion, persuasive authority not binding on us, does indeed state the correct legal standard. *See* Restatement (Second) of Contracts § 350, comment b (1981) ("As a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts.*") (emphasis added). Despite its appropriate citation to the *Ketchikan* standard, however, the trial court ultimately held that "the Government, as the injured party, is not required to seek anything more [than the liquidation value]." *Robinson,* 50 Fed.Cl. at 374. Such an analysis eliminates the "reasonable efforts" requirement of the Restatement and *Ketchikan.*

The trial court acknowledged that while only "reasonable efforts" to achieve value were required, if the government had acted reasonably "it could nonetheless have conducted a private sale more in-line with [the fair market value], or have conducted an *auction to achieve no more than the property's quick sale or liquidation values.*" *Id.* (emphasis added). It thus suggested that the quick sale value of $400,000, like the lesser liquidation value, was achievable with reasonable efforts. Nevertheless, the court concluded the government was required to do no more than obtain the liquidation value ($325,000) and, if offered that price, making no efforts sufficed in lieu of making "reasonable ef-

forts" to market. Moreover, the court, like the government, analyzed the duty to mitigate in a complete vacuum, divorced from the actual real estate facts and considerations of time, cost, and gain shown on this record. Like its SBA resale agent, the government's counsel merely assumes that "reasonable efforts" could require no steps, no calculations of costs versus gain and no delay, regardless of whether and to what degree marketing efforts during a given delay would increase the resale price.

■ Achieving the quick sale value requires at least six months of marketing exposure by definition; liquidation value corresponds to less than six months' marketing. The original auction cost was less than $5,000. Therefore, if the government followed its original plan to re-auction, it could expect to obtain an additional $75,000 (the difference between liquidation at $325,000 and quick sale at $400,000) at a cost of only $5,000. But the government made no analysis at all. It also failed to take any actions whatsoever, much less reasonable efforts under the circumstances. It did not obtain a new appraisal, advertise, call brokers, call any of the twenty-four other bidders in the original auction, inspect the condition of the property or even make the most casual check of local real estate market trends. Instead, it assumed that the property values continued to decline after the May 1993 auction as they had in the period 1990–93. Had the government simply asked, its own appraiser would have advised that land values actually stabilized and perhaps even went up since the May 1993 auction, as he testified at the damages trial.[2] Further,

---

2. The judge describes the appraiser as testifying that based on his November 1994 findings, he "did not believe that the market had continued its downward slope, but rather that the real estate market may in fact have begun to experience a turn-around after depressed real estate prices in 1991, 1992 and 1993." *Robinson,* 50 Fed.Cl. at 371. Thus, the appraiser expressed a clear belief that the market had stabilized *and* a tentative belief that the market may even have changed for the better.

rather than advertise and re-auction, the government did nothing except passively accept an *unsolicited* private offer of $200,000, roughly half the auction-sale price. As justification for this surprisingly low offer, the government accepted the *unverified* (and false) assertion of the offeror that approximately $200,000 in damage to the property had occurred since the May 1993 auction, a time period of approximately eighteen months.

We hold that in the circumstances of this case reasonable efforts in the form of affirmative steps are required to mitigate damages and that relative costs in time and money are primary factors to consider in assessing reasonableness. *See* Restatement (Second) of Contracts § 350, comment b ("[The non-breacher] is expected to take such *affirmative steps* as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.") (emphasis added). The government's resale agent admitted he took no "affirmative steps" at all (merely accepting the unsolicited offer) and that neither he nor his superiors even considered market developments or the ratio of re-auction costs to expected re-auction gains. The market conditions, which are undisputed, suggest that if the government spent $5,000 to re-auction, it would thereby gain $200,000 in sales price. As to time, the government had already waited six months since the breach to resell. During this time, it failed to advertise. If it had, in only a few more months a gain of $75,000 over the liquidation value of $325,000 was practically assured, for the quick sale value of $400,000 requires only 6–12 months' market exposure while the liquidation val-

ue sale requires only up to six months, and it had already waited six months without taking any action.

The government asserts that a "prompt" resale was necessary. And the trial court appears to have accepted such a requirement albeit without any analysis. While citing to other language in *Ketchikan*, the trial court did not even cite the language the dissent quotes that the government must act "reasonably and *promptly.*" *Ketchikan*, 20 Cl.Ct. at 166 (emphasis added).[3]

The idea of a prompt resale comes solely from the word "promptly" in the *Ketchikan* opinion, but it is taken out of context. There, at the time of breach and resale the timber market was depressed. The court held that given the state of the timber market the government's mitigation duties did not require waiting to see if the market might return to prior levels. *See id.* But here the market prices were stable, not depressed. Therefore, it is a misreading of *Ketchikan* to suggest that to mitigate, a government resale must always be prompt. A requirement of prompt resale is thus unsupported by *Ketchikan* or any other cited authority, persuasive or binding. It is, we hold, simply not the law.

In addition, contrary to the dissent's assertion, we reach our decision based on far more evidence than only "the fact that the auction a year earlier yielded Robinson's bid of $394,000 and 24 other bids." As stated above, the government's own appraiser testified that property values had actually stabilized and had even begun to climb in the time since the auction (when he quoted the property's fair mar-

---

**3.** The dissent explicitly adopts the unsupported statement in *Ketchikan* that the government must act "promptly." The entire rationale of the dissent depends on adding a requirement of prompt resale to the mitigation duties of the non-breaching party. Whether promptness is part of mitigation is an issue of law, not of fact, as the dissent presents it. Thus, like the majority's, the dissent's rationale does not depend on fact-finding, but definition of the duty to mitigate—with the court saying affirmative steps are legally required and the dissent saying they are not but promptness is.

ket value at $465,000; its quick sale value at $400,000; and its liquidation value at $325,000). The figures were not disputed. This is compelling, *non-speculative* evidence that was available to the government had it simply taken a minimal affirmative step and asked its own appraiser. Had the government taken other affirmative steps to re-auction, *i.e.*, advertise, it would, on the un-contradicted evidence, have realized about $400,000. That is $75,000 more than the liquidation value. And it was obtainable for only $5,000, the cost of re-auction. Yet the trial court set damages at $69,000.

## IV

■ Because we agree with Robinson's argument that the court committed legal error by not requiring marketing activity that was reasonable under the circumstances, we do not reach its clear-error argument. The government's alleged loss—$194,000 (the difference between the contract price of $394,000 and the actual resale price of $200,000)—was entirely attributable to its dereliction of its duty to mitigate, not the admitted breach by plaintiffs. If the government had made reasonable efforts, it would have re-auctioned and obtained a price of at least $400,000, $6,000 more than the original auction price, and it therefore would have incurred no compensable damages. Therefore, the $29,600 damage order must be overturned. With respect to the $39,400 deposit, the judgment is vacated and remanded for the trial court to ascertain whether the government must return the deposit. The government must return the deposit if on remand the trial court finds that the government elected at trial to pursue litigation damages in lieu of the liquidated damages under § 8 of the contract or that its actions otherwise bar recovery of liquidated damages. Accordingly, the judgment of damages is

*REVERSED IN PART, VACATED IN PART, AND REMANDED.*

## COSTS

Costs taxable to the government.

PROST, Circuit Judge, dissenting.

I respectfully dissent. In May 1993, James Robinson contracted with the government to purchase a former restaurant (the "property") in Lutz, Florida based on his bid of $394,000 at a government-sponsored auction. *Robinson & Fla. Businessmen's Ass'n, Inc. v. United States*, 50 Fed. Cl. 368 (Fed.Cl.2001). One year later, in May 1994, Mr. Robinson breached his contract with the government by abandoning the property. The government recovered the property and approximately 6 months later, on November 28, 1994, it accepted a private offer of $200,000 for the same property. Mr. Robinson was therefore liable for the difference between $394,000 and $200,000.

Mr. Robinson argued before the Court of Federal Claims that the government's private sale of the property at $200,000 was unreasonable. The Court of Federal Claims agreed, concluding that, in connection with its resale of the property after Mr. Robinson's breach, the government had acted unreasonably by not taking sufficient steps to mitigate its damages and that for the government to sell the property "for substantially less than it had recently commanded, without explanation for the decrease, is to act unreasonably." Having reached this conclusion, it was left to the court to determine the appropriate amount of damages, if any, by comparing what Mr. Robinson owed to what the property could and should have reasonably been sold for as a result of his breach. In determining the reasonable value of the property, the court relied on an appraisal done by an expert, Mr. LaFrance, used by both parties and held that "the amount the Government, reasonably informed and with reasonable effort, should have

raised—is $325,000," or the appraised liquidation value of the property. Mr. LaFrance's 1993 appraisal report concluded that if the property were sold within six months, its liquidation value would be $325,000.[1] Based on this finding, the court concluded that the government was only "eligible to recover the contract price of $394,000 less the value of the resale price it should have received—$325,000—reduced by plaintiff's $39,000 deposit."

It is important to note at the outset that the issue on appeal is not whether the government acted reasonably in these circumstances. It was found to have acted unreasonably and that conclusion is not being challenged. Rather, the issue on appeal is what the proper valuation of the property would have been had the government acted properly in selling the property after Mr. Robinson's breach. It is undisputed that the correct standard, stated by the Court of Federal Claims and in *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. 164 (1990), is that the non-breaching party has a "duty to mitigate its damages when a purchaser or seller breaches its contract with the United States." *Id.* at 166. In so doing, however, the "government is not required to make extraordinary efforts to ferret out the single best situation which will absolutely minimize the breaching party's damages. All that is required is that the government act reasonably and *promptly* under the circumstances." *Id.* (emphasis added).

The majority concludes that although the Court of Federal Claims articulated the correct standard in its opinion, it applied the incorrect legal standard to the government's effort to mitigate damages when it concluded that the government was required to seek no more than the liquidation value, $325,000, and make no efforts if offered that price. *Ante* at 1333. With all due respect to the majority, in my view, the Court of Federal Claims both articulated and applied the correct legal standard to the particular facts and circumstances. Thus, its conclusion that the liquidation value of the property was the proper and reasonable valuation for purposes of determining the government's duty to mitigate is a finding of fact that we review for clear error. *See Cooper v. United States*, 827 F.2d 762, 763 (Fed.Cir. 1987) (citing *Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir. 1984) ("We review Claims Court decisions for errors of law and clearly erroneous findings of fact.")).

Clearly, there is some evidence to support the majority's view that $400,000 rather than $325,000 was the proper valuation of the property upon which the court should have based its calculation of damages. But in the end, the majority's conclusion that an auction would have yielded a $400,000 bid is speculative and thus does not provide a sufficient basis, in my view, for overturning the trial court's conclusion that the liquidation value was the appropriate measure of damages.[2] Specifically,

---

1. The appraisal provided that "fair market value" for more than 12 months of marketing was $465,000; that the quick sale value for marketing of between 6 months and one year was $400,000; and that the liquidation value based on marketing for less than 6 months was $325,000. These values represented a significant decline from the $1.3 million appraised value of the property in 1990.

2. The majority concludes that "the government's own appraiser testified that the prop-

erty values had actually stabilized and had even begun to climb in the time since the auction...." *Ante* at 1334. However, I read Mr. LaFrance's testimony regarding market change as quite tentative. He stated only "that the real estate market may in fact have begun to experience a turnaround after depressed real estate process in 1991, 1992 and 1993."

the majority observes that it would have been reasonable for the government to pay $5,000 in fees to have an auction that would provide $75,000 more in gains than the liquidation value. *Ante* at 1334. That view, however, is based solely on the fact that the auction a year earlier yielded Robinson's bid of $394,000 and 24 other bids. I would respectfully submit that the only non-speculative conclusion that one can draw from this history is that an ultimate defaulter was willing to pay almost $400,000 a year earlier and that 24 other individuals also submitted bids for less than that amount with no minimum bid having been required. I find the circumstances here insufficient to overturn the court's conclusion.

Certainly, in cases involving valuation of real estate, there is likely some basis to argue that an alternative course of action would have produced a better result. A reasonable mitigation effort by the government, in my view, however, does not require that the government engage in a lengthy marketing effort lasting from a minimum of six months to one year in order to obtain a price closer to Mr. Robinson's original purchase price. In this case, for example, given that the appraisal based on more than twelve months of marketing indicated the property would have yielded as much as $465,000, if inclined, one could go one step beyond the majority and argue that it would have been reasonable for the government to have followed that course instead. That is why, in these types of cases, and under the circumstances of this case, it would seem imperative that we allow reliance on an undisputed appraisal based on liquidation value.

Further, in my view, the majority is correct that the record in this case reveals a complete absence of volitional acts by the government here to sell or market the property at issue. But the government has already been held accountable for its failures. It lost in the Court of Federal Claims precisely because its actions, or lack thereof, in connection with its resale were held to be unreasonable. Therefore, the only issue remaining on appeal is what the proper valuation of the property would have been had the government acted both reasonably and promptly. In these circumstances, it is my view that the Court of Federal Claims correctly held that the liquidation value was the proper measure. If the non-breaching party is given the choice between two reasonable courses, the breaching party "cannot complain that one rather than the other is chosen." *McCormick on Damages*, Chapter 5, § 35 (1935). For the foregoing reasons I would affirm the Court of Federal Claims' decision.